# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
Assigned on Briefs August 15, 2017

## STATE OF TENNESSEE v. CARLOS PRATHER

**Appeal from the Criminal Court for Shelby County**
No. 15-00459        Chris Craft, Judge

_____

### No. W2016-01234-CCA-R3-CD

_____

Defendant, Carlos Prather, pled guilty to two counts of vandalism over $1,000 and was sentenced to concurrent sentences of ten years as a Range III offender, to be served on supervised probation. As a condition of probation Defendant was ordered to complete the Jericho Program. On February 5, 2016, a probation violation warrant was issued alleging that Defendant violated the terms of his probation by being arrested for passing bad checks, failing to report the arrest, non-compliance with the Jericho Program, and being arrested for contempt of court on February 4, 2016. After a hearing, the trial court revoked Defendant's probation and ordered him to serve his original ten-year sentence in the Department of Correction. Defendant now appeals, contending that the trial court erred by revoking his probation and ordering him to serve his sentence in confinement. After thoroughly reviewing the record and applicable authorities, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, P.J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and ROBERT L. HOLLOWAY, JR., JJ., joined.

Andrea D. Sipes, Jackson, Tennessee, for the appellant, Carlos Prather.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Counsel; Amy P. Weirich, District Attorney General; and Reggie Henderson, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

*Probation Violation Hearing*

Warren Hampton testified that he is an employee of the Department of Probation and Parole and the "keeper of the record" as to Defendant's file. He said that Defendant was placed on probation for ten years for vandalism over $1,000. Mr. Hampton testified that Defendant violated the terms of his probation by being arrested for contempt of court, and he failed to report the arrest to his supervising probation officer. He said that Defendant was also instructed to complete the Jericho Program; however, Defendant "was in non-compliance with the program and he returned home."

Oddye Fisher is a recovery support specialist with Alliance Healthcare Services, and he was assigned to Defendant. He explained that when he receives a referral to the Jericho Program, he completes an assessment to determine which services might be suitable for a client in order to be successful. Mr. Fisher said that Defendant did not comply with the conditions of his probation because he was in non-compliance with the Jericho Program. Mr. Fisher testified that Defendant initially went home to attend intensive outpatient services with Urban Family Ministries. He stopped by Defendant's home after a couple of weeks and found Defendant "inebriated after drinking beer." Mr. Fisher attempted to talk with Defendant about seeking a higher level of treatment but Defendant did not comprehend what he was saying. Defendant was then placed in CAAPS (Child, Adolescent, and Adult Psychiatry Services) for inpatient treatment but he was discharged after "a day or so" because of unruly behavior and abusive language. Defendant then went back home to continue outpatient treatment.

Mr. Fisher testified that Defendant was allowed to "seek some treatment because the treatment we said that we sought for him we didn't seem to be finding the right fit so we asked him to find something." Defendant called several places and was admitted to Delta Medical and was there for two or three weeks. Mr. Fisher testified:

> At the discharge planning, they suggested that he go to - - they had an aftercare, six weeks aftercare sober living. They identified housing in the South Memphis Area. He said he had some history of not being successful at [not] using in that area because he didn't want to go there. He didn't want to follow their program. But we suggested, recommended that he did [sic] because he was under their care. We knew it would be better. We also thought that when he came to court for the status reports, that it would be in his best interest if he was following the clinical director, the person giving him care. And he refused to follow up. He refused to follow up on that recommendation and he chose to go back home and to continue participating in intensive outpatient with Urban Family Ministries. We made it clear to him that

we didn't know how the [c]ourts would take it for not following Delta Medical advice and going back home.

Went back home and when he came for the status update for the [c]ourt, it was recommended that he not follow his plan and follow the plan that was placed by them.  He couldn't do what was suggested by Delta at that time because he was away from them.  So then we sought - - he found again some placement with Lakeside.  He found [sic] Lakeside kept him for probably a week.  And again he was discharged and discharged home to IOP.

But Lakeside did not - - Lakeside did not recommend an intensive - - they didn't recommend an aftercare for him so he went back home and he resumed doing what he was doing.

\*       \*       \*

Which was going to Urban Family Ministries intensive outpatient and being at home.  We still talked and we told him that we didn't know how the [c]ourt would respond when he wasn't in a high level care because we talked about him being in a high level care.

He then agreed to go to Provisions, which was another transitional program, and intensive IOP and started attending IOP done in CAAPS going in Provisions.

While at Provisions, it was reported by Provisions staff that he came back under the influence.

Mr. Fisher testified that Defendant would leave the premises of Provisions and consume alcohol and then return intoxicated.  He said that Provisions sent Defendant home over the weekend and asked him to "clean up."  Defendant went back there the following week and "re-engaged with them, doing the outpatient with them."  Mr. Fisher testified that Defendant was then arrested for writing a bad check to Provisions. Defendant went back home and "continued IOP was done [sic] at CAAPS."  Mr. Fisher believed that outpatient treatment was not working for Defendant to maintain his stability but that is what Defendant "kept reverting back to."  Mr. Fisher also felt that he did everything within his "professional power" to encourage Defendant to follow the requirements of probation, and he worked diligently on Defendant's case to help him achieve his goals.  He agreed that in some instances, Defendant was choosing to do what Defendant wanted to do.

On cross-examination, Mr. Fisher testified that Defendant had some significant mental health issues, and he took several antipsychotic medications. Defendant also had alcohol dependence and other drug abuse issues. Mr. Fisher agreed that it was not unusual for people in his care to have relapses with substances such as alcohol. Mr. Fisher testified that Defendant completed the initial 120 days of the Jericho Program; however, he had difficulty with the transitional aspects of the program in the second part. He agreed that Defendant had the responsibility in many cases to find his own places of treatment.

Defendant testified that he was enrolled in the Jericho Program, which was a condition of probation for his vandalism charge. He completed the first part of the program, which was outpatient, and a treatment plan was put in place for him. Defendant admitted that he had a couple of relapses due to his alcohol problem. The first relapse occurred during a family gathering in August after his release in July. Defendant said that he called Mr. Fisher to come to his house to answer a question. Defendant said that he had a beer when Mr. Fisher arrived, and he told Mr. Fisher that he might need inpatient treatment because he was not strong enough to be at home.

Defendant testified that he went to court, and the judge ordered him to attend the CAPPS program. He said that while at CAPPS, he was reading a piece of paper on a desk, and someone accused him of stealing, and he was discharged from the program. Defendant testified that Mr. Fisher did not have another program for him, so he walked across the street and asked Delta Medical if something was available for him. He was then admitted to Delta Medical for three days, and he was released to go to court. Defendant further testified:

> But when I was there, they was trying to send me to a sober living home, but Mr. Fisher and I couldn't get a clear understanding because he said he didn't know how the Court was going to feel [about] Delta sending me somewhere. So they said I had a choice. So I choose to go back home and continue outpatient with Urban Ministry[.]

Defendant testified that the Sober Living Program was located in South Memphis. He told Mr. Fisher that he was uncomfortable being in South Memphis because a lot of his problems began there, and he had a criminal history there. Defendant said that he had a choice, and he chose to go back home, and he was supposed to continue outpatient treatment with Urban Ministry. Defendant testified that he had trouble attending classes with Urban Ministry due to "transportation issues." He went to court and was ordered back to Delta Medical. Defendant testified that Delta Medical kept him for two or three days, and he was transferred to "Mobile Crisis" who kept him for five days, and he was released. Defendant testified that after his release he called five places seeking inpatient treatment but they either did not accept his insurance or have any bed space. One of the places referred him to Lakeside where he was admitted and remained for approximately

three weeks. Defendant testified that Mr. Fisher told him that he did not have to stay there because he found Defendant a "Sober Living home" in South Memphis, and Mr. Fisher picked him up from Lakeside and took him to the home.

Defendant testified that his second relapse occurred when he learned that he would have to pay $500 per month for the Jericho Program, and his sister, who was his "payee," did not show up at the outpatient class to pay his fees. He said that Mr. Williams, who was the coordinator at Sober Living, would not allow him to stay there without full payment. Defendant testified: "But I didn't want to just leave the program, so I went home, but I continued to go to class [.]" He noted that the class was a treatment class through Donnie Crouch. Defendant testified that he returned to Sober Living home once his sister paid all of the fees. He was also ordered by the trial court to take a drug screen. Defendant testified that due to financial problems, he was allowed to go home and continue outpatient treatment with Mr. Crouch. Defendant testified that he took the drug screen, which was negative, and he continued treatment. He explained that the relapse occurred because he thought that his probation would be violated when his sister initially failed to pay his fees, and he went to a relative's house in South Memphis and began drinking beer.

Defendant testified that he had also used cocaine in addition to drinking alcohol. However, he had not used cocaine since starting the Jericho Program. Defendant testified that he returned to Delta Medical for less than a month, and they discovered that he "had some more health problems." He said they added more medications which did not always react well with him. Defendant noted that some of the medications caused him to sleep for long periods of time, and some of them made him sick. He also returned to outpatient treatment classes with Mr. Crouch. Defendant testified that he was supposed to attend classes on "Monday, Wednesday, and Friday. Then all of a sudden they said every day after I left treatment." Defendant said that he attended class every day "up until the last three days." He testified: "Well, I showed up on the last day. I didn't have enough energy to focus and stay, so I went in and left. But the days I missed and was late or anything, I always called Mr. Crouch to try to stay on the same page with him." Defendant testified that he learned a lot in class but he did not attend some classes because the medication was overpowering him. He said that he struggled with "[a]lcohol and anger" but treatment had helped him, and he was "stable."

*Analysis*

Defendant argues that the trial court erred by revoking his "supervised release and ordering him to serve the original sentence in the Tennessee Department of Corrections." He contends that the trial court "relied primarily on the Appellant's past criminal behavior." We disagree.

A trial court may revoke a sentence of probation upon a finding by a preponderance of the evidence that the defendant has violated the conditions of his release. T.C.A. § 40-35-311(e) (2006); *Stamps v. State*, 614 S.W.2d 71, 73 (Tenn. Crim. App. 1980). A revocation will be upheld absent a showing that the trial court abused its discretion. *State v. Harkins*, 811 S.W.2d 79, 82 (Tenn. 1991). In order to establish that the trial court has abused its discretion, the defendant must show that there is no substantial evidence to support the determination that he violated his probation. *Id.* (citing *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978); *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980)). Relief will be granted only when "'the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)). Upon finding a violation, the trial court may "revoke the probation and suspension of sentence and cause the defendant to commence the execution of the judgment as originally entered." T.C.A. § 40-35-311(e). Furthermore, when probation is revoked, "the original judgment so rendered by the trial judge shall be in full force and effect from the date of the revocation of such suspension." *Id.* § 40-35-310. The trial judge retains the discretionary authority to order the defendant to serve the original sentence. *See State v. Duke*, 902 S.W.2d 424, 427 (Tenn. Crim. App. 1995). This Court has held "that an accused, already on probation, is not entitled to a second grant of probation or another form of alternative sentencing." *State v. Jeffrey A. Warfield*, No. 01C01-9711-CCA-00504, 1999 WL 61065, at *2 (Tenn. Crim. App. Feb.10, 1999), *perm. app. denied* (Tenn. 1999).

The trial court made the following findings:

> Well, I'll say this: As far as the Jericho Program, I think it's a fine program. Steve Bush, when he was just an assistant, created this program. I was helping, trying to get it done.
>
> And we had this program for people who basically - - to tear down the walls for people who have mental illness. No questions [Defendant] has had a problem with mental illness.
>
> And the particular case we have now, he's been committing crimes all of his life. He's got an anger problem. I've had to find him in contempt of court here. He can't control himself. And we tried to structure these problems.
>
> And in this particular case he basically took a big rock and smashed out his neighbor's storm door, all the windows on her car. Thousands of dollars of damage.

And to try - - the very last thing we could try, we tried to get [Defendant] in this program so he could learn to control himself. I have no doubt that [Defendant] would like to stay in the program and change, but it's just not working for him. And that's the problem, is that [Defendant] is continuing to violate the program. Obviously, with the meds he's on, if he drinks, it's going to make his meds ineffective.

And I hate to say it, but - - and I don't like giving up on people, but I've given up on [Defendant]. I just - - I know he hadn't given up on himself, but, you know, after the mental examinations in this case it's clear.

Finally, Dr. Zaeger - - I mean, they had to - - they went through all his medical records and they said, "No, his mental illness did not affect his ability to know right from wrong when he did this."

And [Defendant] all his life had committed crimes in anger. And we've tried everything we can try and it's just not working. And at some point, I can try and it's just not working. And, at some point, I have to say, "Well, all right. Enough from [Defendant]. We'll have to start guarding the public." And I think we're at this point.

I mean, I understand that he's trying to get in this and that and the other. He'd like to stay out of jail and continue to have these anger episodes and lash out and destroy things and hurt people and threaten people. It's just not working.

And for this reason, because of this horrible record - - we gave him ten years in the Department of Correction and I suspended a ten-year sentence to try to get him some help. Knowing he's looking at ten years, and [Defendant] still - - it's just not working.

So I cannot keep him on this program. I'm going to have to show his probation revoked. I mean, we just cannot continue to allow him out there not following the rules.

\*      \*      \*

And [Defendant], you're not going to be taken to the Department of Corrections and put in the Department of Corrections system. I think they'll probably take you to the DeBerry Center, which handles people with mental issues, and try to treat you because some day you'll be back out in the world.

The record in this case supports the trial court's finding that Defendant violated the conditions of his probation by not completing the Jericho Program. Defendant argues that the trial court relied on his past criminal record to revoke his probation; however, we find that Defendant is incorrect in his assertion. Rather, the trial court in this case "reviewed [Defendant's] past criminal history in order to determine whether the beneficial aspects of probation were being served." *State v. Marcus Nigel Davis*, No. E2007-02882-CCA-R3-CD, 2008 WL 4682238, at *5 (Tenn. Crim. App. Oct. 23, 2008). Additionally, it appears that the trial court took a "totality of the circumstances approach in order to decide whether [Defendant's] probation violations merited incarceration or another opportunity for rehabilitation. After doing so, the court determined that [Defendant] was not amenable to continued probation." *Id.*

Mr. Fisher testified that while Defendant was attending intensive outpatient services with Urban Family Ministries through the Jericho Program, he found Defendant inebriated at home after drinking beer to the point that he did not comprehend what Mr. Fisher was saying. Defendant was then placed in CAAPS and was discharged after "a day or so" because of unruly behavior and abusive language. Defendant tried several other treatment programs through the Jericho Program, and he failed to follow the treatment plan recommended by Delta Medical. Defendant was finally placed at Provisions; however, it was reported by the Provisions staff that Defendant would leave their premises and consume alcohol and then return intoxicated. Mr. Fisher testified that Provisions then sent Defendant home for the weekend in order to sober up, and he returned the following week and "re-engaged with them, doing the outpatient with them." However, Defendant was arrested for writing a bad check to Provisions. Defendant went back home. Mr. Fisher testified that outpatient treatment did not work for Defendant to maintain his stability but that is what Defendant "kept reverting back to." Although Defendant completed the initial 120 days of the Jericho Program, he did not complete the second part. We note that the trial court did not address Defendant's arrests for passing bad checks or the contempt of court other than to say: "I've had to find him in contempt of court here." The only evidence of the arrests presented by the State at the revocation hearing was Mr. Fisher's testimony concerning the bad check to Provisions, that Defendant was arrested for contempt of court, and he failed to report the arrest to his supervising probation officer. However, even without considering the arrests, the record is sufficient to support the revocation of Defendant's probation based on his non-compliance with the Jericho Program.

We conclude that upon revoking Defendant's probation, the trial court did not abuse its discretion in ordering Defendant to serve his original sentence in confinement. Defendant is entitled to no relief in this appeal.

**CONCLUSION**

Based on a thorough review of the record, the brief of the parties, and the law governing the issue presented for review, the judgment of the trial court is affirmed.

_____
THOMAS T. WOODALL, PRESIDING JUDGE